JOHN M. KEEP, *Plaintiff in Error*,

*vs.*

GEORGE B. SANDERSON, Garnishee of Manchester and Wentworth, *Defendant in Error*.

ERROR TO THE CIRCUIT COURT OF ROCK COUNTY.

An assignment, made by a debtor in failing circumstances, of all his estate, and which empowers the assignee " to sell and dispose of the assigned property upon such terms and conditions as in his judgment may appear best and most to the interest of the parties concerned," confers upon the assignee authority to sell on credit.

An assignment, made under circumstances as above stated, which authorizes the assignee to sell on credit, operates to delay and hinder creditors, and as against such creditors, is fraudulent and void.

It is competent for debtors in failing circumstances to make an assignment of their property for the payment of their debts, but they cannot restrict the liability of their assignee, nor extend his powers beyond the limits which are prescribed by law.

It is the right of the creditor to have the estate of the debtor subjected to the payment of his debts without any delay which may be occasioned solely by the acts or stipulations of the debtor; and all such acts and stipulations as necessarily tend to hinder and delay such application of the estate of the debtor, are fraudulent and void as to creditors.

Whether general words in an assignment, purporting to convey all the property of the assignor, are controlled and limited by the schedules appended, and to which reference is made?

This cause was originally commenced by the plaintiff in error, by a writ of attachment against Manchester & Wentworth, as principal debtors, and by garnishee process against the present defendant in error, George B. Sanderson. At the September term of said court, the plaintiff obtained judgment against Manchester & Wentworth for the sum of $3,539.11 damages, and costs.

Afterwards, during the same term of the said Circuit Court, the said Sanderson, as garnishee, appeared

and filed his answer, taken before a justice of the

peace, which was stipulated to be of the same effect as though taken in open court, and was as follows:

" *1st Question*—At the time of the service of the garnishee process in this case, upon you, had you, or at any time after, have you had any property, goods, chattels, notes, mortgages or choses in action in your possession or under your control, belonging to the defendants in this suit, or either of them?

" *Answer*—I had no property, goods, chattels, notes, mortgages, or choses in action, of any name or nature, belonging to the said defendants, or either of them, in my possession or under my control, at the time of the service of the garnishee process on me, in this case, nor at any time after. I further answering say, that on the 19th day of February, 1852, the said defendants made an assignment to me in writing, which said assignment is recorded in the office of the register of deeds of Rock county aforesaid, a copy of which assignment is hereto annexed, by virtue whereof there came into my hands on the said 19th day of February last, from the said defendant's goods, wares and merchandise to the amount of about seven thousand dollars, notes, mortgages and accounts to the amount of about six thousand dollars, and real estate to the amount of about two thousand dollars, all of which, or the proceeds thereof, I still hold under and by virtue of said assignment."

### COPY OF ASSIGNMENT.

" This indenture, made this nineteenth day of February, in the year one thousand eight hundred and fifty-two, by Thomas C. Manchester and Charles R. P. Wentworth, co-partners under the name, style and firm of T. C. Manchester & Co., of the first part,

and George B. Sanderson, of the town of Beloit, county of Rock, and State of Wisconsin, of the second part; whereas the said copartnership is justly indebted in sundry considerable sums of money, and has become unable to pay and discharge the same with punctuality or in full, and the said parties of the first part are now desirous of making a fair and equitable distribution of their property and effects among their creditors; now, therefore, this indenture witnesseth, that the said parties of the first part, in consideration of the premises, and of the sum of one dollar to them in hand paid by the party of the second part, the receipt whereof is hereby acknowledged, have granted, bargained and sold, released, assigned, transferred and set over, and by these presents do grant, bargain and sell, release, assign, transfer and set over unto the said party of the second part, and to his heirs and assigns forever, all and singular, the lands, tenements and hereditaments, situate, lying and being within the States of Wisconsin and Illinois, and all the goods, chattels, merchandise, bills, bonds, notes, book accounts, claims, demands, choses in action, judgments, evidences of debt, and property, of every name and nature whatsoever, of the said parties of the first part, more particularly enumerated and described in the schedule hereto annexed, marked 'A.' To have and to hold the same and every part thereof, with the appurtenances, to the said party of the second part, his heirs, executors, administrators and assigns; in trust, nevertheless, and to and for the following uses, intents and purposes, that is to say, that the said party of the second part shall take possession of all and singular, the lands, tenements and hereditaments, property and effects hereby assigned, and sell and dispose of the

same upon such terms and conditions as in his judg-

ment may appear best and most to the interest of the parties concerned, and convert the same into money, and shall also collect all and singular, the said debts, due bills, bonds, notes, accounts, claims, demands and choses in action, or so much thereof as may prove collectable, and thereupon execute, acknowledge and deliver all necessary conveyances and instruments for the purposes aforesaid, and by and with the proceeds of such sales and collections, the said party of the second part shall first pay and disburse all the just and reasonable expenses, costs and charges and commissions of executing and carrying into effect this assignment, and all rents, taxes and assessments due or to become due on the lands, tenements and hereditaments aforesaid, until the same shall be sold and disposed of, and by and with the residue, or net proceeds and avails of such sales and collections, the said party of the second part shall first pay and discharge, in full, the several and respective debts, bonds, notes and sums of money due or to grow due from the said parties of the first part, or for which they are liable to the persons and firms designated in the schedule hereto annexed, marked Class No. 1, together with all interest moneys due or to grow due thereon ; and if said net proceeds and avails shall not be sufficient to pay and discharge the same in full, then such net proceeds and avails shall be distributed *pro rata*, share and share alike, among the said several persons and firms named in said schedule, marked Class No. 1, according to the amount of their respective claims ; and secondly, by and with the residue and remainder of the said net proceeds and avails, if any there shall be, the said party of the second part shall pay and dis-

charge all the other co-partnership debts, demands and liabilities whatsoever now existing, whether due or hereafter to become due, or for which the said parties of the first part are liable, to the several persons and firms designated in the schedule hereto annexed, marked Class No. 2, provided such remainder shall be sufficient for that purpose, and if insufficient, then the same shall be applied *pro rata*, share and share alike, to the payment of said debts, demands and liabilities, according to their respective amounts.

"Thirdly—By and with the residue and remainder of said nett proceeds and avails, if any there shall be, he, the said party of the second part, shall pay and discharge all the other co-partnership debts, demands and liabilities whatsoever now existing, whether due or hereafter to become due, provided such remainder shall be sufficient for that purpose, and if insufficient, then the same shall be applied *pro rata*, share and share alike, to the payment of said debts, demands and liabilities, according to their respective amounts.

"Fourthly—By and with the residue and remainder of the said nett proceeds and avails, if any there shall be, the said party of the second part shall pay and discharge all the private and individual debts of the parties of the first part, or either of them, whether due or to grow due, provided such remainder shall be sufficient for that purpose, and if insufficient, then the same shall be applied *pro rata*, share and share alike, to the payment of the said debts, according to their respective amounts.

"And for the better execution of these presents, and of the several trusts hereby reposed, the said parties of the first part do hereby make, nominate and appoint the said party of the second part, and

his executors and administrators and assigns, their and each of their true and lawful attorney irrevocable, with full power and authority to do, transact and perform all acts, deeds, matters and things, which can or may be necessary in the premises, as fully and completely as the said parties of the first part, or either of them, might or could do were these presents not executed; and attorneys one or more under him, to make, nominate and appoint, with full power of substitution and revocation, hereby ratifying and confirming all and everything whatsoever that our said attorney and his attorneys shall do or cause to be done in the premises. In witness whereof, the said parties of the first part and second part have hereunto interchangeably set their hands and seals the day and year first above written.

" T. C. MANCHESTER,    [L. S.]

" C. R. P. WENTWORTH,    [L. S.]

" GEO. B. SANDERSON.    [L. S.]

" Sealed, signed and delivered
    in presence of

       " J. NIEL,

       " W. C. SPAULDING.

" STATE OF WISCONSIN,   ⎰
   *Rock County*, *ss:*   ⎱

" On this 19th day of February, in the year 1852, personally appeared before me Thomas C. Manchester, Charles R. P. Wentworth and George B. Sanderson, to me known to be the individuals described in, and who executed the foregoing assignment, with the schedule 'A,' Class No. 1 and Class No. 2, accompanying the same, and severally acknowledged the due ex-

ecution thereof, freely and voluntarily for the uses and purposes therein mentioned.

"W. C. SPAULDING,

"*Notary Public.*

" Shedule 'A' referred to in the foregoing assignment:

" All the real estate conveyed by J. W. Thayer and wife to T. C. Manchester and C. R. P. Wentworth, under deed dated 14th of August, 1850, and recorded in Rock county, Wisconsin, 15th August, 1850, in volume 'M' of deeds, on page 223.

" Also the lots in Tenney's addition to Beloit, as conveyed by Tenney and wife to the said parties of the first part, and numbered as follows: 72, 73; 74, 75, 51, 53, 55, 57, 52, 54, 56, 58, 47, 50.

"Also all the other real estate of the party of the first part, situate in the town of Rockton, Winnebago county, Illinois.

" All the stock in trade in the store at present occupied by the said parties of the first part."

Class No. 1 and Class No. 2 are appended to the assignment, and contain the names, &c., of the creditors referred to.

Answer of George B. Sanderson, garnishee, taken in open court this first day of October, 1853.

*Question.* Where was the assignment you have referred to thus far executed?

*Answer.* It was executed at Beloit.

*Question.* Where was it drawn up?

*Answer.* It was drawn up at my house, in or near Beloit.

*Question.* Was it executed there?

*Answer.* I think I executed it there; I am not pos-

itive; but I think Manchester and Wentworth signed <span style="float:right">Dec. Term<br>1853.</span>
it there also.

<span style="float:right">Keep<br><i>vs.</i><br>Sanderson.</span>

They were at my house when it was drawn up.

*Question.* When were you first solicited to accept the trust?

*Answer.* On the 19th February, 1852, I was requested by both of them to accept the trust.

*Question.* Where were you when they made the request?

*Answer.* I was at my house; it was in the daytime; both Manchester and Wentworth asked me to accept the assignment; I refused at first, on account of the trouble and annoyance; I afterwards accepted the trust. This was in my dining-room; the assignment was then being prepared; it was prepared by James Neil; he was in my house at the time; I can't tell why they came to my house to prepare the assignment; I had seen Mr. Neil at the time this application was made to me at my house; I can't tell how long they, Manchester and Wentworth, had been at my house; I can't tell whether they came together to my house or not; I don't recollect that they gave any particular reason for making the assignment, only that they were embarrassed; they said Mr. Keep had demands against them, and if Keep pressed the debt it would break them up; I think the debt was said to be about $3,000; they told me that Keep applied to them for payment; they further said that they offered him the choice of their notes and accounts, and he had refused. They did not say that they wanted to make the assignment to prevent Keep's levying on the goods; they thought Keep would prosecute; they wanted to make the assignment to make a fair distri-

D

bution among the creditors; I don't think that they gave as a reason for making the assignment, that their creditors would prosecute them. I first became acquainted with Wentworth at Weston, in Missouri; I came to Beloit about two years after he did; Wentworth had about $3,000 in cash when he came to Wisconsin; so he told me. The assignment was delivered to me at the store on the same day it bears date; it was delivered to me by Mr. Neil; the store was open, and Mr. Sewall was there; Manchester and Wentworth lived in Beloit at the time; Mr. Wentworth had a house in Beloit; there was real estate attached to the house, about an acre; Wentworth claimed to own the house; he had owned it about a year and a half; the house and lot cost about $4,000; it was furnished with ordinary house furniture; the furniture belonged to Mr. Sewall; I do not know that Wentworth had any of the property; Wentworth carried a silver watch worth $25 or $30; Sewall kept house; the house is within the recorded town plat; I should think it was in Hackett's addition; I do not know that Manchester had any individual property; I think he carried a watch, a gold one. Manchester commenced building a house on a lot on the west side of the river, in Beloit. I understood it belonged to his wife; I do not know that he has conveyed the lot within a few days; I do not know that he has, since assignment, conveyed one half of Rock River House; I do not know that he owned any other property; the store was open up to the delivery of assignment; the name of firm was T. C. Manchester & Co. At the time of assignment they did not have one dollar on hand that I know of; they had checks out for bor-

rowed money, to the amount of $40; I do not know that they paid; I have not paid; the assignment, with the schedule attached just as it is now, was delivered to me at the time of the assignment; there was one mortgage in the hands of the attorneys for collection; one was in the hands of Keep & Todd; there was none in the hands of Spaulding & Crosier; the mortgage was vs. Blackburn, living in Illinois; I do not remember any other; to the best of my knowledge, the amount of the mortgage was $200; I do not know that after Manchester and Wentworth assigned to me they removed goods out of the store; there were no judgments before justices of the peace in Beloit or Illinois, in favor of Manchester and Wentworth, that I know of; they never told me that they had removed $200 worth of goods apiece out of the store; I do not know that a demand vs. Samuel Adams, in favor of Manchester and Wentworth came to my hands; I do not know that a debt of large amount was paid by Adams to Wentworth after the assignment; Wentworth went to California about the last of May, 1852; I do not know how he obtained funds to go; he got no funds from my hands; I do not know what means he had to go with; at the time of the assignment, I do not know that there were any debts or demands in the store belonging to Manchester and Wentworth.

The amount of notes, accounts and mortgages was about $7,000; there was a safe, and all the fixtures of the store, and some oats and corn; the safe cost $130, the platform scales are worth $15 or $20, scales $2.50, stove $10, desk $10; the fixtures in the store would be worth $100 or more, besides the safe; the books, notes, accounts, and all demands came into my hands;

judgments of Manchester and Wentworth came into my hands of the amount of $7,000; there were goods in the store—dry goods, groceries, crockery, &c.; it was inventoried at about $7,000 or $8,000; do not think the goods are worth what they are inventoried at.

I am not at present a merchant; I have been; the goods have come to my hands; I have part of the goods; I have the proceeds in my hands; I think that there should be a deduction of 40 per cent.; I sold the remnant of the stock to John Hackett about ten days ago; I have collected some of the demands, I can't tell what amount without referring to the books; when the assignment was delivered, the goods were on the shelves as they formerly had been; the oats and grain were valueless.

The cash credit to C. R. P. Wentworth, - $3,721 77
           Debit,     -     -     -     2,368 32

Cash bal. in Wentworth's favor,     -     - $1,353 45
T. C. Manchester, Credit,     -     -     -     628 68
           Debit,     -     -     -     5,949 99

Against, - · -     -     -     -     - $5,321 31

The above is an abstract from the cash book of T. C. Manchester & Co., taken by Mr. Sewall; Wentworth's credit was for cash; the credit to Manchester was in cash; Manchester, before the co-partnership with Wentworth, had been in the mercantile business in Beloit; Wentworth had also been in business in Beloit; they went into co-partnership in the summer of 1850, and continued until February 19, 1852.

I should say from Manchester's books that while he was alone in business he did a credit business; I have

had his books in my hands since the assignment was
made; I found them in the office, and took the liber-
ty of looking at them; in forming the co-partnership,
I think he was credited with the accounts on his
books, but they have never all been collected, and
some portion of the $628.68 was derived from collec-
tions of those accounts, as I think; the account shows
the transaction between the several members of the
firm; the account charged as Manchester's is about
$6,000, and he put in goods and accounts about 5 or
$6,000; I don't know where the books and accounts of
Manchester are now; in August, 1850, I lent C. R. P.
Wentworth $3,000, and forwarded it to Manchester in
N. Y., by check drawn in my favor; it formed a part
of Wentworth's cash credit in the firm; it has not
been paid to me; $500 has been paid to me; inter-
est was 12 per cent.; the debt became due in August,
1851; I received one year's interest by goods from
store; I endorsed on note in October, 1851; the note
was signed by Wentworth; I have a mortgage on the
house and lot of Wentworth in Beloit—something
over $2,800; I do not know of Wentworth buying
land since the assignment; I bought some—about 30
feet—for myself; it was not bought to benefit Went-
worth; I bought it because I thought the Wentworth
property would come into my hands; it was 20 feet
wide and depth of lot about 8 rods; it joins on the
east side; he had made an arrangement about six
weeks before with Thornburgh; I bought the prop-
erty at a sheriff's sale vs. Thornburgh. He, Thorn-
burgh said if I would buy his property and give him
a deed back, he would deed me the twenty feet front
that I have referred to; Wentworth gave me the in-
formation first that I could get the property, as Thorn-

Dec. Term
1853.

Keep
vs.
Sanderson.

burgh was hard up for money ; I made the bargain for my own benefit.

*Cross-examined* on his own behalf:

The property of the co-partnership came into my possession on the 19th February, 1852, and has been controlled by me ever since ; they had no co-partnership property to my knowledge that was not included in the assignment ; I was engaged as a silent partner in mercantile business two years, and had access to all the concerns of the partnership during that time, when I became acquainted with the business of a merchant.

*Question.* What did the assignors deliver under the words stock in trade, mentioned in the assignment ?

*Answer.* The safe, all the notes, bonds and mortgages, all the goods, book and books of account, together with all the deeds of the real estate of Manchester and Wentworth in this state and Illinois, and all the fixtures. One mortgage in the hands of Keep I have never received.

There was an inventory made, including the accounts, books of accounts, mortgages, fixtures, and all the goods and every thing connected with the business of Manchester and Wentworth. There was an account made of the mortgage in Keep's hands. There is a mortgage before my mortgage on Wentworth's house of $400 or $500, at 12 per cent. My mortgage is over $2,800. I do not think the property would sell for more than the amount of incumbrances. I bought the property next to it, fearing that I should have to become the owner of the Wentworth property. The avails of the co-partnership is not sufficient to pay the debts of the firm ; there is not property sufficient to pay creditors of first and second class.

Wentworth lived in the house of Sewall. Sewall oc-
cupied the house, and Wentworth lived with them.
They said they wanted to make a fair distribution
among their creditors. I had no motive in taking
the assignment than in good faith to carry out the in-
tention of the assignors.

And for a further answer I do also state that I have
been engaged in mercantile transactions, and acquaint-
ed with the business, and that from my own knowl-
edge, as well as from the authority of authors on
book-keeping, and as I am informed by experienced
book-keepers, the words "stock in trade" have a pro-
fessional or technical meaning. That they include not
only goods on hand for sale, but the proceeds of the
same, whether exchanged for money, other goods, or
notes or accounts, and that under the words "all the
stock in trade" all of the co-partnership assets are
embraced, of every name and nature ; and that under
the words contained in the assignment, and under
the assignment, I claim that the property in the notes,
books and accounts passed to me, as such assignee, by
virtue of such assignment, as well as in the goods ;
and that I am ready to maintain and prove that the
words "stock in trade," in the schedule annexed to
such assignment, has such technical or professional
meaning, as this court shall direct.

And I further answer that the capital stock of
Manchester and Wentworth was made up in the first
place of cash capital put in by Wentworth, to about
$3.721, and of goods, notes and accounts, put in by
Manchester, to the amount of $6,000 ; that said ac-
counts of Manchester were credited to him upon the
books of Manchester and Wentworth ; and that the
paper from which I made my statement in relation

to the cash transactions of Manchester and Wentworth, was a statement from the footings upon the cash book, and does not show how the stock of the company was made up, or how the accounts actually stood between them.

GEORGE B. SANDERSON.

At the same term the counsel for the plaintiff moved the court for judgment against the garnishee, upon the facts disclosed by his answer. But the court overruled the motion and gave judgment for the garnishee for costs, &c., to which the plaintiff excepted. There were several specific points upon which the court was called upon to decide, and which are incorporated into the bill of exceptions, but as the determination of the case is made upon other grounds, it is not deemed necessary to incorporate them in the report.

*Sleeper & Carpenter*, for plaintiff in error.

The answer of the defendant, Sanderson, being satisfactory to the plaintiff, he was entitled to judgment thereon, if it showed that the defendant had effects in his hands belonging to Manchester and Wentworth. *Rev. Stat.* 592.

The assignment was made to delay Keep, and was therefore fraudulent as to him. The general words of the assignment include the notes and accounts which we seek to reach, but they are controlled by the words "more particularly described in the schedule annexed." *Rundlett vs. Dale*, 10 *N. H. R.* 458 ; *Beard vs. Kimball*, 11 *N. H. R.* 471. The schedule contains no description or enumeration of the notes and accounts. But it is contended that they are included in the clause "all the stock in trade, in the store at present occupied by Manchester and Went-

worth." To this, we answer, the words "stock in trade," in their ordinary signification, include nothing but the goods and wares kept for traffic ; when used alone, they are limited here by the words "in the store at present occupied," &c. The answer does not show that the notes and accounts were in the store occupied, &c., at the time of the assignment, consequently they are not shown to be included in the assignment.

This court will render the judgment that should have been rendered by the court below. 3 *Hill*, 391; 5 *id.* 507.

*D. Noggle,* for defendant in error.

The words "stock in trade" have a professional and technical meaning, and as such include the entire property, real and personal, of a mercantile firm. The entire property is represented by the "stock" account, and the assets can be nothing more or less than a substitute for stock account, increased by the gains, or decreased by the losses. 1 *Am. Lead. Cases,* 496 ; 2 *Bouv. Law Dic.* 544–591; *Merch. Manual,* 159–172.

The court will examine the whole transaction, for the purpose of giving force to the instrument, according to the true intent and meaning of the parties. 2 *Met. R.* 105–152 ; 5 *id.* 574–585 ; 4 *id.* 539.

Stock, or stock in trade, signifies the capital of a merchant, or other person, including his merchandize, money and credits, and to which may be added the real estate and all other property belonging to the business. 2 *Bouv. Law Dic.* 554–591 ; *Merch. Manual,* 159.

The court below properly overruled the plaintiff's motion, for want of jurisdiction to render judgment against defendant in error upon said motion. *Const.*

DEC. TERM
1853.

Keep
*vs.*
Sanderson.

*U. S.,* 17 *Rev. Stat.* ; *Const. Wisconsin,* 19 *Rev. Stat.*; *Rev. Stat.* 417 ; 5 *N. H. Rep.* 113 ; 5 *Pick. Rep.* 28 ; 4 *Mason,* 206.

*By the Court,* CRAWFORD, J. The defendant in error, Geo. B. Sanderson, was summoned as a garnishee in a proceeding by attachment, instituted by John M. Keep against Thomas C. Manchester and Charles R. P. Wentworth. The garnishee appeared in the Circuit Court for Rock county, and from his disclosure it appeared that he held a large amount of real estate, goods and merchandize, accounts, notes and other securities, to the amount of about *fifteen thousand dollars,* all of which, or the proceeds thereof, were in his hands at the time of his disclosure, and that he held the same by virtue of an assignment thereof to him as assignee, made by Manchester and Wentworth, for the benefit of certain of their creditors.

The plaintiff in the action, Mr. Keep, recovered judgment against the principal defendants, Manchester and Wentworth, for the sum of $3,507.20 and costs, and thereupon moved the court for judgment against the garnishee, upon his disclosure. This was refused by the Circuit Court, and a judgment in favor of the garnishee, (defendant in error,) for costs, was rendered.

The principal enquiry is, whether assignment to the defendant in error is a protection to him as garnishee? And this depends upon the validity of the instrument. From the response it appears that the garnishee obtained the possession of the assigned property immediately after the execution of the deed of assignment, and at a time when the assignors, Manchester and Wentworth, were in failing circumstances,

and apprehended proceedings at law by one of their creditors, (John M. Keep, the present plaintiff in error,) for the recovery of his debt.

It also appears from the deed of assignment, which is embodied in the disclosure of the garnishee, that he is authorized to sell and dispose of the assigned property " *upon such terms and conditions as in his judgment may appear best, and most to the interest of the parties concerned.*"

The judgment of the assignee is here made the criterion by which his authority and discretion in regard to the sale and disposition of the assigned property is to be measured.

It is competent for debtors in failing circumstances to make an assignment of their property for the payment of their debts, but in doing so they are not at liberty to restrict the liability of their assignee, or extend his powers beyond the limits which are prescribed by law; because the effect of a valid assignment is to place the property beyond the reach of the ordinary process of the courts resorted to by creditors to enforce their claims, and hence the liability of the assignee to those creditors ought not to be curtailed beyond that provided by law, at the mere volition of the assignor and assignee.

Suppose that in the *judgment* of the assignee it would be to the best interests of the parties concerned to dispose of any portion of the property *on credit*, could it be truly said that under this instrument he has not the power to do so? We think it could not, because the language used in the deed— " upon such terms and conditions "—is sufficiently comprehensive to include the power *to sell upon credit*. A sale is either for cash or upon credit, and the price

agreed upon, as well as the *time* at which the payment shall be made, is necessarily included in the *terms and conditions* of the sale. (*Vide Le Roy vs. Beard*, 8 *Howard*, 451.)

At the last term of this court in the case of *Hutchinson et al. vs. Lord*, 1 *Wis. R.* 286, we held that an assignment for the benefit of creditors, which empowered the assignee to sell " upon such terms, and for such prices," was equivalent to a power to sell *upon credit*, and we think the reasons assigned by us for our conclusion in that case, are equally applicable in this. Whenever the assignee can, within his authority, postpone the payment of the price of assigned property sold by him, he thereby necessarily *delays* the creditors interested in such assigned property, in the collection of their demands, and inasmuch as the assignor must be deemed to have intended the legal consequence flowing from every provision contained in his assignment, such a provision as that of which we now treat, must be taken as evidence apparent on the face of the instrument, of the intent with which it was executed.

There was no issue joined in this case, to be submitted to a jury, and the question was one of law, addressed to the court, on the whole answer of the garnishee, whether he was liable. We hold that the assignment in this case does empower the assignee to sell upon credit, and is clearly within the principle decided in *Hutchinson et al. vs. Lord*, and that the Circuit Court should have held the defendant in error liable for the property (or its value) held by him, regardless of the assignment, which, by its very terms, must be esteemed fraudulent in law and in fact.

It is useless, in this case, to decide any question

touching the specific property included in the assign-
ment, after having decided that it is invalid; but if
it were necessary, we think the cases of *Rundlett vs.*
*Dale,* 10 *New Hamp. R.* 458, and *Beard vs. Kimball,*
11 *id.* 471, present the law applicable to the case.

The case of *Wilkes and Fontaine vs. Ferris,* in-
volved the construction of an assignment for the ben-
efit of creditors, in which the language used was, " all
the goods, property, wares, merchandizes, chattels,
vessels, debts, sum and sums of money, claims and de-
mands and effects belonging to and now due and owing
to the said H. C. or to which and in which he has any
right, property, claim or demand, which said goods,
wares and merchandizes hereby granted and sold,
are particularly described and enumerated in the
schedule A, signed by the said H. C. and to these pres-
ents annexed," &c.

The court say " this was not in fact a general assign-
ment of *all* C.'s estate, for though the words in one
place be general, yet the assignment immediately goes
on to specify by a reference to the schedules annexed,
the specific articles of property assigned, and it there-
fore could operate only upon the articles specified.
*Wilkes et al. vs. Ferris,* 5 *John.* 335; see also *Munro
vs. Allaire,* 2 *Caine's,* 327.

The judgment of the Circuit Court must be revers-
ed, and the cause remanded for further proceedings,
according to law.